# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 01-3648

JOHN DOE and JANE DOE, individually and on behalf
of their minor son, JOHN DOE, JR., and JOHN ROE and
JANE ROE, 1-7, and GREENDALE BAPTIST CHURCH AND
ACADEMY,

*Plaintiffs-Appellants,*

*v.*

CARLA HECK, individually and in her official capacity
as a case worker for the Bureau of Milwaukee Child
Welfare, JOHN WICHMAN, individually and in his
official capacity as a case worker for the Bureau of
Milwaukee Child Welfare, and CHRISTINE HANSEN,
individually and in her official capacity as a service
manager for the Bureau of Milwaukee Child Welfare,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99 C 907—**J. P. Stadtmueller**, *Judge.*

———————

ARGUED MAY 30, 2002—DECIDED APRIL 16, 2003

———————

Before FLAUM, *Chief Judge*, and HARLINGTON WOOD, JR.,
and MANION, *Circuit Judges.*

MANION, *Circuit Judge*. Several weeks after learning that administrators of the Greendale Baptist Church and Academy used corporal punishment as a form of discipline in primary grade school, caseworkers for the Bureau of Milwaukee Child Welfare initiated an investigation for child abuse. Over the objection of the Academy's principal, and without a warrant or parental notification or consent, the caseworkers removed eleven-year-old John Doe Jr. from his fourth-grade classroom and interviewed him about corporal punishment that he and other students may have received and certain family matters. Thereafter, the caseworkers unsuccessfully attempted to interview John Jr.'s parents and sister, and threatened to remove the Doe children from their parents' custody. The caseworkers also attempted, on a separate occasion, to interview other students at the Academy, whom John Jr. had identified as having been spanked, but the principal at the school flatly refused to grant them access to the children without a court order or parental consent. The Bureau eventually ended its investigation due to lack of information, and the Academy and parents filed suit against three child welfare caseworkers, in both their individual and official capacities, alleging that the manner in which they handled the investigation violated their rights under the Fourth and Fourteenth Amendments to the United States Constitution. The defendant caseworkers filed a motion for summary judgment, arguing that they were entitled to qualified immunity from the plaintiffs' suit. The district court granted the motion, and the plaintiffs appeal. Although we conclude that some of the actions taken by the defendants during the course of the Bureau's investigation were unconstitutional, we, nevertheless, agree with the district court that the caseworkers are entitled to qualified immunity from plaintiffs' suit. The district court's decision is, therefore, affirmed.

## I.

The Bureau of Milwaukee Child Welfare ("Bureau"), a division of the Wisconsin Department of Health and Family Services ("Department"), provides child abuse prevention and related services in Milwaukee County. The Bureau receives reports of child maltreatment at its intake office. When an intake screener receives a call, he drafts an intake form to "screen in" or "screen out" the report for investigation. If the report is screened in, an intake supervisor will assign it an urgency level to determine how quickly an investigation must be initiated. Although state law technically requires a 24-hour response to all screened-in reports, Bureau guidelines separate reports into three categories: (1) 0-2 hour response; (2) 24-hour response; and (3) 2-5 day response. Once an urgency level has been assigned by the intake supervisor, the intake office then opens a file and e-mails it to one of the five field offices, each covering a particular geographic area. After the file is received by a field office, a site supervisor assigns the file to a caseworker, who is then required to contact the reporter(s) (of child abuse), "collateral contacts" (i.e., eyewitnesses or others with knowledge of the situation), and the alleged maltreater, and to document all such contacts. The Bureau's "Investigation Standards" establish the protocols for investigating different types of alleged maltreaters. For example, if the alleged maltreater is a parent, the caseworker must, in descending order, interview the child, any siblings, the non-maltreating parent (if applicable), and the maltreating parent. Caseworkers must also investigate: (1) physical evidence (e.g., injuries); (2) "systems assessment" information about the child and family; and (3) reports from anyone with information about the case. Based on all of the foregoing information, the caseworker and supervisor assigned to the case must

then determine whether to substantiate that maltreatment has indeed occurred.[1]

On September 8, 1998, the Bureau received a letter claiming that a ten-year-old female student, M.G., had been bruised by a spanking that she received at Greendale Baptist Church and Academy, Inc. ("Greendale" or the "Academy"), a private Christian school. The Bureau took no action on this letter, neither screening it in nor screening it out. On September 30, 1998, the individual responsible for reporting the incident sent a second letter to the Bureau because it had not yet responded to the first one. The Bureau did not process either report of maltreatment, however, until November 3, 1998, when, nearly two months after the initial complaint, it was given a 24-hour urgency designation and assigned to John Wichman, an experienced Bureau caseworker.

On November 4, 1998, Wichman interviewed Mrs. P., M.G.'s guardian and great-grandmother, to discuss the allegation of mistreatment. Mrs. P. told Wichman that M.G. (then a third-grader) had been spanked twice by Greendale's principal, Troy Bond, within the first two weeks of the school year, and that she noticed a bruise on the girl's back after the second spanking. Mrs. P stated that neither she nor her husband physically disciplined M.G., that she disagreed with Greendale's corporal punishment policy, and that she withdrew the child from the school shortly after the second spanking. She also expressed concern for the other students at Greendale, and provided Wichman with a copy of the Academy's hand-

---

[1]  According to the Bureau's Investigation Standards, substantiation depends on four primary sources of information: (1) observation and interviews with principal sources; (2) interviews with secondary sources; (3) agency records; and (4) written reports from other professionals.

book, which outlined the school's disciplinary policy.[2] Finally, Mrs. P. told Wichman that she had talked to the police about the situation, and that they had advised her

---

[2] When a child is enrolled at Greendale, parents are given a copy of the school's "Parent/Student Handbook." During the relevant time period, this handbook included the following section on "disciplinary procedures":

MARK SYSTEM

The mark system will be used for enforcing discipline and control in the classroom. Penalties for marks are at the discretion of the individual teacher. Marks are accumulated weekly for students in all elementary grades, and they begin each week with a clean record. Three marks in one day or four marks in one week will result in 1 swat to be administered the same day the last mark was given.

MARK OFFENSES

| First Mark | Verbal reprimand |
| Second Mark | Note sent home to parents |
| Third Mark | Student sent to office to meet with principal. Fifteen-minute detention after school the next school day |
| Fourth Mark | Student meets with principal for 1 swat |

MAJOR OFFENSES

The child will be sent immediately to the principal for disciplinary action, and the parent will be notified. An attempt will be made to notify the parents when corporal punishment is needed; however, a swat will be given regardless [sic] if the parent can be reached or not. All discipline must be given the same day as the offenses were made, and the principal will administer the swat. Parents should deal with each mark at home to deter getting enough marks for a swat.

that nothing could be done without pictures of the alleged injury—pictures she had not taken.

Nearly two weeks later, on November 16, 1998, Wichman interviewed M.G. alone to discuss the spankings she received while attending Greendale. M.G. described the spankings to Wichman, indicating that the first time physical punishment was given for inappropriate behavior (e.g., lying), and the second time was due to rule violations that she claimed were not her fault. She stated that the second paddling was administered above the rear area, approximately six inches above her tailbone, and that she had struggled to get away from Bond. M.G. also informed Wichman that she knew of at least one other student, a boy named John (i.e., plaintiff John Doe Jr.), who had been spanked by Bond as well. She did not say, however, that John Jr. had been hurt by the spanking. Based solely on the statements of Mrs. P. and M.G., Wichman concluded that M.G. had been bruised by the second spanking.

The next day, on November 17, 1998, Wichman met with his supervisor, Christine Hansen, to discuss his contacts with Mrs. P and M.G.; specifically, the injury M.G. had allegedly received as a result of the second spanking administered to her by Bond and M.G.'s assertion that another student at Greendale had been spanked as well. Wichman expressed his concern to Hansen that: (1) "the principal may have been out of control in administering the physical punishment to [M.G.], and may have been out of control at other times with other children, and may be again when administering this type of punishment"; (2) young children "were being subject to this type of phys-

ical discipline";[3] (3) "the parent/student handbook specified this type of punishment was used"; and (4) "a number of the parents [might have] prior Child Protective Services referrals." After reviewing the Greendale parent/student handbook and Wichman's written reports of his interviews with Mrs. P. and M.G., Hansen "decided that the report of abuse as to [M.G.] could be substantiated because there was credible evidence from the student and [her guardian] that the abuse had occurred. . . . [and] that further investigation into the circumstances of the second child [identified by M.G. as having] been swatted was in order."[4] The decision to substantiate M.G.'s abuse was contrary to Bureau's Investigation Standards, which provide that substantiation can occur only after the assigned caseworker has obtained statements from all "pertinent persons," including the alleged maltreater and any eyewitnesses. At the time Hansen made the decision to substantiate Bond, Wichman had not interviewed Bond or M.G.'s teacher, Carol Finck, who was present during both of the girl's spankings.

On November 25, 1998, Wichman interviewed M.G. again to obtain a physical description of the student she identified during the first interview as having been spanked by Bond. On December 7, 1998, at Hansen's be-

---

[3] Greendale educates children from kindergarten to fourth grade.

[4] The decision to expand the investigation to include other students at Greendale came after Hansen and Wichman consulted with Bureau attorney, Barb Reinhold. According to Hansen, "[a] framework was provided to us by our attorney, and we implemented the framework. . . . [to] identif[y] other children who [M.G.] thought may have been hit like she had been . . . ."

hest, Wichman prepared an internal case summary on the alleged spanking of John Doe Jr. and "the allegations in regards to corporal punishment that has [sic] been uncovered at the Greendale Baptist Academy." After reviewing the case summary, and consulting with Bureau attorney Reinhold, Hansen concluded that it would be appropriate for a caseworker to interview John Doe Jr. at the school. She also determined that John Jr.'s parents should not be notified of the interview, believing that they might be complicit in any abuse that may have occurred, since they presumably knew of the school's corporal punishment policy but did not prevent their child from being spanked.

In order to facilitate the expanded investigation, Hansen and Reinhold directed Wichman to complete an intake referral form for John Doe Jr., which he did on December 14, 1998. On that form, Wichman noted his opinion "[t]hat any child in the Academy that has been physically disciplined in the manner that this [case]worker's assessment ha[s] revealed, should be also assessed for CPS services." Finally, more than three months after the first complaint, the report was screened in for a 24-hour investigation, and, on December 15, 1998, the file was assigned to Carla Heck, another Bureau caseworker.

On December 16, 1998, Wichman and Heck went to Greendale to interview John Doe Jr.[5] They did not call the school ahead of time because Bond, the principal, was the

---

[5] The district court noted that although "Ms. Heck presumably discussed the case with Mr. Wichman [before visiting Greendale] . . . [she] did not document any discussions she may have had," and that "[t]his apparent failure violated [Bureau] 'protocol,' which indicates that all contacts with a reporter (even a co-worker) should be documented."

alleged maltreater. Prior to their departure, Bureau "super-visors and upper management," which included Bureau attorney Reinhold, advised Wichman and Heck that if John Jr. identified other children who had been spanked, they were required to make referrals on those children in the same manner that John Jr. had been referred. Wichman and Heck also took along a copy of Wis. Stat. § 48.981(3)(c)1, which provides, *inter alia*, that "[t]he agency may contact, observe or interview the child at any location without permission from the child's parent, guardian or legal custodian if necessary to determine if the child is in need of protection or services, except that the person making the investigation may enter a child's dwelling only with permission from the child's parent, guardian or legal custodian or after obtaining a court order." Both Wichman and Heck believed, from training and as a matter of Bureau policy, that this statute gave them the authority to interview John Jr. at Greendale without a court order or the consent of his parents or the school.[6]

At approximately 2:15 p.m., Wichman and Heck entered the foyer of Greendale Baptist Church (the school is located inside the church building). When Principal Bond came out of his office to greet them, Wichman and Heck advised him that they were with the Bureau and had come to the school to interview a student. After requesting and receiving proper identification, Bond asked them to identify the child they wished to interview. Wichman and Heck then gave Bond a physical description of the child and a first name ("John"), which Bond immediately recog-

---

[6] Section 48.981(3)(c)(1) has been interpreted as providing Bureau caseworkers with the authority to interview children at school without the permission of parents or school personnel. *See* 79 Wis. Op. Atty. Gen. 49 (1990).

nized as John Doe Jr. Bond asked Wichman and Heck to wait in the foyer while he notified the church's assistant pastor, Gary Holloway, of their intent to interview John Jr. Shortly thereafter, Bond returned to the foyer with Holloway. Holloway asked Wichman and Heck whether he was legally required to allow them to interview the boy. Wichman and Heck told Holloway that he was required to allow them to conduct the interview, provided him with a copy of § 48.981(3)(c)1, and advised him that the statute gave them the authority to interview the child at school without notice or parental consent. Holloway stated that it was his understanding that a court order was required before a private school could be forced to allow such an interview to take place on its premises. Wichman told Holloway that a private school was no different than a public school under the statute, and that they had the authority to conduct the interview at the school. Heck stated that they could call the police, who would then force the school to allow the interview in short order. Holloway then asked what the interview would involve, and whether he or Bond could be present during the questioning. Wichman and Heck stated that their investigation was confidential, that they were not at liberty to disclose the purpose of the interview, and that neither Bond nor Holloway could be present during the interview. At this point, Bond and Holloway told Wichman and Heck that they were not going to allow the caseworkers to interview John Jr. without a court order, and suggested that the police be called to intervene in the matter. Wichman then left the building and called the police from his cellular phone.

Shortly thereafter, Officer Michael Adamczak arrived on the scene and met with Wichman and Heck in the church's parking lot. Unsure of how to proceed, Adamczak called the police station and requested guidance from his

supervisor, Captain Robert Dams, on how to handle the matter. Dams called the local district attorney's office, and received confirmation that § 48.981(3)(c)1 gave the case-workers the authority to interview children suspected of abuse on school premises without having to notify or obtain the consent of their parents or the school. Dams and two other police officers then traveled to Greendale to as-sist Adamczak in advising Bond and Holloway that the caseworkers had the authority to interview John Doe Jr. Although Holloway reluctantly agreed to allow the inter-view, he remained apprehensive about doing so and ques-tioned Dams about whether the caseworkers needed a court order. Dams advised Holloway that "a court or-der was not needed for an interview under exigent cir-cumstances,"[7] and presented him with another copy of § 48.981(3)(c)1. After Dams made it clear that he was go-ing to force the school to allow Wichman and Heck to interview John Jr., Bond and Holloway allowed the case-workers to proceed with their investigation. John Jr. was then escorted to the nursery section of the church for the interview.

During the interview, John Doe Jr., a fourth-grader, told Heck that Bond had spanked him once with a long wood-en paddle approximately four months ago, and that he held back tears during the spanking. He also stated that after the spanking Bond and his teacher, Carol Finck (who had witnessed the spanking), prayed with him. Although she had not yet spoken with Bond or Finck, Heck immedi-ately suspected that abuse had occurred "due to the fact that a fourth-grade boy would admit to wanting to cry."

---

[7] Although Dams made reference to "exigent circumstances," neither the caseworkers nor the police officers indicated that they believed John Jr. was under any threat of immediate harm.

Heck also asked John Jr. whether his parents were aware that he had been spanked. The boy indicated that they were aware of the spanking. Heck then asked whether his parents had ever paddled him at home. John Jr. stated that both he and his sister had been spanked before by their parents, and laughed as he told Heck of an incident where the plastic paddle used by his parents to spank them broke during a spanking of his sister. He then told Heck that after the plastic paddle broke, his parents used a plastic or metal spatula to spank them. Heck also asked John Jr. about his father's military history, where his father worked, and where his sister attended school. Finally, Heck asked John Jr. whether he knew of any other students at the school who had been spanked. John Jr. stated that he was aware of at least six other students, whom he identified for Heck.

After the interview, Wichman and Heck attempted to interview Bond, but Bond declined to answer any of their questions without an attorney present. Wichman then gave Bond his business card, and requested that he call to arrange a time when they could meet. Wichman and Heck made no attempt, however, to interview Carol Finck, the teacher who had witnessed the spankings administered by Bond to both M.G. and John Doe Jr. The caseworkers and police then drove to the Doe residence to interview John Jr.'s parents, but they were not home. Heck left a note for the Does, requesting that they contact her immediately regarding an urgent matter. Later that day, Mrs. Doe returned home, saw the card, and immediately called Heck. Heck was not in at that time, and Mrs. Doe left her a voice message. Within approximately fifteen minutes, Heck called Mrs. Doe back to arrange a meeting. Mrs. Doe told Heck that she was overwhelmed that the Bureau had interviewed her son at school, but nonetheless agreed to meet with her the following day at 3:00 p.m.

On December 17, 1998, Mrs. Doe telephoned Heck thirty minutes before their scheduled appointment to reschedule the meeting for sometime after the holidays. Heck asked why she was cancelling the appointment so close to the time of the meeting. Mrs. Doe simply repeated that it was necessary for her to reschedule the meeting. Heck then became angry, informed Mrs. Doe that she "could take this whole thing up a notch," and "go to the District Attorney with what I already have." Heck also stated that she did not believe Mrs. Doe was taking the matter seriously and that she and her husband were "hindering [the] investigation." Mrs. Doe told Heck that neither she nor her husband were attempting to hinder the Bureau's investigation, and that they both respected the work performed by social workers. Prior to the conclusion of the conversation, Mrs. Doe advised Heck that she and her husband would be retaining an attorney, and that she would have the attorney contact Heck regarding the Bureau's investigation of their family. Before Mrs. Doe could say goodbye, Heck slammed the phone down, hanging up on her. In her written report, Heck indicated that "she [Mrs. Doe] cancelled the meeting and refused to discuss anything further."

Later that day, Wichman called Greendale's attorney, Michael Dean, to set up an interview with Bond. Dean proposed that they all meet at his office, but Wichman demanded that the meeting take place at the Bureau. Wichman then told Dean that if the meeting did not take place at his office, he would simply report that Bond had refused to be interviewed. After the conversation, Dean wrote a letter to Wichman memorializing the offer to meet at his office, but Wichman never responded to the letter and made no further attempts to interview Bond. Instead, Wichman misrepresented to Hansen and David Hergert,

a deputy director with the Bureau, that Bond had flatly refused to be interviewed.

On December 18, 1998, Wichman and Heck went to several private schools in the area in an attempt to interview John Doe Jr.'s sister, but they were unable to locate her. Later that afternoon, Heck called Mrs. Doe to schedule an interview, but Mrs. Doe informed her that she and her husband had not yet secured the services of an attorney. Heck went on vacation on the next day, and did not return until December 28, 1998. During her absence, however, Wichman continued to work on the case, and, on December 21, 1998, conferred with Hansen and Bureau attorney Reinhold on how to proceed with investigating the possible maltreatment of the other children identified by John Jr. as having been spanked by Bond. There was some confusion on the appropriate course of action, as the Bureau had little experience dealing with private schools or individuals represented by counsel. There was also some discussion of turning the entire matter over to the police, but they eventually decided to open "companion" files on all of the children.[8] They also decided to interview the children identified by John Jr. without notifying or obtaining the consent of their parents, once again assuming that the parents were aware of the school's disciplinary policy, had consented to it, and were not protecting their children from being spanked by Bond.

---

[8] In one of Heck's written reports, she indicated "it is unknown whether the parents of children attending this school [Greendale] are aware of the discipline techniques being used," that she was "not aware of any action taken by the school in response to these incidents," and that she felt "any child attending this school who has been subjected to inappropriate physical discipline should be assessed for [Bureau] services."

On December 23, 1998, Wichman issued "mandatory" reports on the other Greendale students being investigated. Contrary to Bureau protocol, however, Wichman opened a file on the corporation, "Greendale Baptist Academy," rather than on the specific children or parents. He did so without the knowledge or consent of Hansen, who later indicated that she had "no inkling" why Wichman had handled the cases in such a manner. Using a church membership directory that he had taken from Greendale, Wichman also ran background checks (for prior contacts with the Bureau) on every family listed in the directory, whether they had children enrolled at the school or not. Although Hansen did not "exactly agree" with this action because she "felt [it] a little too intrusive," she did not object to Wichman conducting the background checks.

On December 28, 1998, at approximately 9:00 a.m., the Does received a telephone call but chose not to answer the phone, deciding instead to let the caller leave a voice message. The caller did not leave a message, however, and Mrs. Doe dialed star (*) 69 to ascertain where the call had originated. This process revealed that the call had been placed by someone at the Bureau. A few minutes later, the phone rang again. Once again, the Does allowed the call to go into their voice mail. This time, Heck, having returned from vacation, left a voice message, informing the Does that: (1) she had yet to hear from their attorney; (2) if she did not heard from their attorney within 24 hours, "the Bureau will take steps to . . . protect the children in your home . . . under Chapter 48";[9] and (3) "This

---

[9] Another Bureau supervisor, Iris Colon Lucio, testified in a deposition that she considered Heck's demand that the Does provide her with the name of their attorney within 24 hours to

(continued...)

is it! I am not messing around anymore!" (slamming the phone down). This message upset the Does greatly because they interpreted it as a threat to remove their children from their custody. Shortly after hearing Heck's message, the Does contacted their attorney, who immediately called Heck to advise that she had been retained by the Does but needed time to confer with them before an interview could be arranged.[10]

That same day, Wichman had a meeting with Sergeant Belli and Officer Adamczak of the Greendale Police Department, during which he informed the officers that the Bureau was still in the process of conducting its investigation of Greendale, and supplied them "with copies of [Bureau] reports . . . a copy of the [school's] handbook, the church directory and some information [the Bureau] received off of the Internet in regards to Bob Jones University." Wichman also told the officers that if the Does did not have their attorney contact the Bureau within the next 24 hours, he and Heck planned to go to their residence

---

[9] (...continued)
be unreasonable, noting that "[i]t's not something that I would say is generally—something we would request . . . ."

[10] Throughout the remainder of the Christmas season, the Does allege that they "lived in constant fear that Ms. Heck or one of her associates would come to [their] home and remove [their] children," and that this fear caused them: (1) to maintain "a continual watch for strange vehicles, believing that Ms. Heck or an associate might come in an unmarked car or van"; (2) not to let their children play outside (during this time period) without one of them present to "guard to [e]nsure no [Bureau] case worker came for them"; (3) to put up blankets over their windows to prevent Heck or anyone else with the Bureau from monitoring their activities; and (4) to purchase a caller identification system to screen any calls from Bureau caseworkers.

and physically remove the children from their custody so that they might be interviewed.[11] Finally, Wichman advised the officers that "due to the large number of juveniles" that needed to be interviewed, the Bureau would be seeking the police department's assistance in the near future.

On January 6, 1999, Wichman, Heck, and Christopher Partridge, another Bureau caseworker, went to Greendale for the purpose of interviewing the six children identified by John Doe Jr. as having been spanked by Bond. Notwithstanding the degree of resistence they had previously faced, the caseworkers made no attempt to obtain a court order before attempting to interview these students. When the caseworkers arrived at Greendale, Bond refused to allow them to interview any of the children without a court order. Wichman advised Bond that the Bureau caseworkers had the authority under state law to interview the children on the school's premises, and that, if necessary, he would call the police to force him to comply with their demand. Bond maintained that he would not allow the caseworkers to speak with any of the children regardless of any police involvement. At this point, the caseworkers exited the building, entered the Bureau van, and began calling various individuals for instructions on how to proceed. Heck called Bureau attorney Reinhold to ask for her advice. Partridge informed his supervisor, Mike Kemp, of the stalemate. Kemp directed the caseworkers to call the police for assistance, which Wichman did. After fifty minutes of waiting outside, Wichman called the po-

---

[11] Christine Hansen testified in a deposition that Wichman's stated intention to the police that he would seek to remove the Doe children from their parents' custody, if true, would have been illegal, a drastic step, and inconsistent with Bureau protocol.

lice again. Two police officers eventually responded to the call, but after conferring they all decided to return to the police station for further deliberations. Upon arriving at the police station, the caseworkers learned that the school's attorney, Michael Dean, had called the police and requested that the caseworkers be barred from Greendale's property as trespassers.

Unsure of how to proceed, Heck called Reinhold again and one of the police officers called the district attorney's office. It was determined that the caseworkers had the authority to enter the school for the purpose of conducting interviews with the children. The caseworkers then returned to Greendale, this time accompanied by four police officers. Before re-entering the building, however, the caseworkers received a call from Kemp, who cautioned them not to push the matter too far. Once inside, the caseworkers and police officers were met by Bond and Dean. The police officers told them that the caseworkers had a duty to investigate allegations of child abuse, and that if Bond refused to grant the caseworkers access they had no problem playing "hardball"—i.e., arrest Bond for obstruction of justice. Dean advised the police that his client was taking this position because the children were in the physical custody of Greendale and the school did not have the authority to grant the Bureau permission to speak with the children without parental consent, remarking, "I don't know why they don't just get an order from a judge. If they get the order then we can't do anything about it."

Notwithstanding the threat of arrest, Bond refused to allow the caseworkers to interview the children without a court order or parental consent. The police officers and caseworkers then made several calls to the district attorney's office and the Bureau to advise their superiors of

Bond's refusal to give the caseworkers access to the children. After conferring with Bureau supervisor Hergert, the caseworkers abandoned their efforts to interview the children due to the level of resistence they had encountered. On her way out of the building, Heck told Bond, "This case is not over yet, believe me." Additionally, one of the officers informed Bond and Dean that a shift commander would be coming to the school, and that there was a distinct possibility that the police department "would direct their own investigation, which would include interviewing the children at the Academy." The Does, in response to the foregoing events, took their children to a friend's house later that evening to spend the night, fearing that someone from the Bureau would come to their home and attempt to remove their children from their custody. The next day, Mrs. Doe purchased a cellular phone to enable her to keep in constant contact with her husband regarding the Bureau's ongoing investigation of their family.[12]

In late February 1999, Bureau supervisor Iris Colon Lucio telephoned the Does' attorney, Sheila Smith, to speak with her about the ongoing investigation. Smith told Lucio that the Does adamantly denied abusing their children. Lucio informed Smith that the Bureau would hold the Does liable if the school applied corporal punishment to their son resulting in physical abuse, and instructed Smith to advise the Does accordingly. On February 28, 1999, shortly after this conversation, Lucio sent Smith a follow-up letter advising that the investigation of the Does was being closed because "[i]n discussing the matter with you, we

---

[12] According to Mrs. Doe, she took a leave of absence from work from December 17, 1998 through January 19, 1999 because she "was afraid to be away from her children for any length of time . . . not knowing what [the Bureau] might do."

have been assured that there is no safety, nor service needs for the . . . family." The Bureau's internal documents, however, indicated that the investigation had been closed because of the Does' refusal to cooperate, thus preventing caseworkers from substantiating abuse. A few months later, the Bureau ended its investigation of Greendale altogether; caseworkers never returned to the school and eventually all of the files relating to the investigation were closed.

On August 12, 1999, Greendale, John and Jane Doe (individually and on behalf of their minor son, John Doe Jr.), and seven other parents (John and Jane Roe 1-7), filed suit against Heck, Wichman, and Hansen, individually and in their official capacities with the Bureau,[13] pursuant to 42 U.S.C. § 1983, alleging that the defendants: (1) conducted an unreasonable search of Greendale's premises in violation of the Fourth Amendment; (2) illegally seized John Jr. in violation of the Fourth Amendment; (3) violated all of the plaintiffs' rights to familial relations under the Fourteenth Amendment; and (4) violated all of the plaintiffs' rights to procedural due process under the Fourteenth Amendment. The plaintiffs also challenged the constitutionality, both facially and as applied, of Wis. Stat. § 48.981(3)(c)1, to the extent this statutory provision

---

[13] To the extent the plaintiffs' suit against the defendants in their official capacities with the Bureau seeks retrospective monetary damages, this action constitutes a suit against the state that is prohibited by the Eleventh Amendment. *Darryl H. v. Coler*, 801 F.2d 893, 906-07 (7th Cir. 1986). This aspect of the plaintiffs' suit is, therefore, dismissed for lack of subject matter jurisdiction. *Id.* at 907; *see also id.* at 907 n.13 (noting that "a question of subject matter jurisdiction . . . may be raised at any time in the litigation").

purportedly provides Bureau caseworkers with the au-
thority to "contact, observe or interview . . . [a] child at
any location without permission from the child's parent,
guardian or legal custodian if necessary to determine if
the child is in need of protection or services . . . ." *Id.* In this
respect, the plaintiffs sought injunctive relief from the
enforcement of this aspect of Wis. Stat. § 48.981(3)(c)1,
and requested a declaration that the statutory provision
was unconstitutional. In response, the defendants argued
that none of the actions they took during the Bureau's
investigation violated the plaintiffs' constitutional rights,
and, alternatively, that even if their actions were uncon-
stitutional, the constitutional rights at issue in this case
were not clearly established, thereby entitling them to qual-
ified immunity from the plaintiffs' suit. The defendants
also maintained that § 48.981(3)(c) is constitutional, both
facially and as applied to the plaintiffs. Thereafter, the
parties filed cross motions for summary judgment. The
district court granted the defendants' motion, concluding
that they were entitled to qualified immunity from the
plaintiffs' claims. The plaintiffs appeal this decision.

## II.

On appeal, the plaintiffs contend that the district court
erred in granting the defendants' motion for summary
judgment, a decision we review *de novo*, construing all
facts in the light most favorable to the plaintiffs. *Ben's
Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 707 (7th Cir.
2003).

The parties' principal dispute in this case concerns wheth-
er qualified immunity shields the defendants from any
liability arising out of the plaintiffs' constitutional claims.
In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court

held that a court's qualified immunity analysis must proceed in two steps. *Id.* at 200. The threshold inquiry is whether, taken in the light most favorable to the party asserting the injury, "the facts alleged show the officer's conduct violated a constitutional right[.]" *Id.* at 201. This must be the initial inquiry. *Id.* If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Id.* If, on the other hand, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* We proceed in this fashion because this analytical framework "promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 616 (7th Cir. 2002). With these principles in mind, we now consider the merits of the plaintiffs' respective claims on appeal.

## A. Fourth Amendment Claims

We begin our analysis with Greendale and John Doe Jr.'s claims that the defendants conducted an illegal search and seizure on the premises of the school, pursuant to Wis. Stat. § 48.981(3)(c)1, in violation of the Fourth Amendment.[14] The Fourth Amendment, incorporated against the States by the Fourteenth Amendment, *Contreras v. City of Chicago*, 119 F.3d 1286, 1290 (7th Cir. 1997), provides that "[t]he right of the people to be secure in their persons,

---

[14] A private school, like any other corporation or business, is entitled to bring a Fourth Amendment challenge for the illegal search of its premises. *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 353 (1977); *See v. City of Seattle*, 387 U.S. 541, 543 (1967).

houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. Because the basic purpose of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials," *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528 (1967), the amendment's prohibition against unreasonable searches and seizures protects against warrantless intrusions during civil as well as criminal investigations by the government. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978). Thus, the strictures of the Fourth Amendment apply to child welfare workers, as well as all other governmental employees. *Brokaw v. Mercer County*, 235 F.3d 1000, 1010 n.4 (7th Cir. 2000); *Darryl H. v. Coler*, 801 F.2d 893, 900 (7th Cir. 1986).

The threshold consideration in a Fourth Amendment inquiry is whether the governmental conduct in question constitutes a search or seizure within the meaning of the amendment's text. *Kyllo v. United States*, 533 U.S. 27, 31 (2001); *Brokaw*, 235 F.3d at 1010. In this case, defendants Wichman and Heck, with the assistance of the police, investigated allegations of child abuse on the premises of Greendale. As part of that investigation, they took John Doe Jr. into custody to interview him. We think it is clear that the foregoing actions constitute both a search and a seizure under the Fourth Amendment.

When the Fourth Amendment was ratified, as now, to "search" meant " '[t]o look over or through for the purpose of finding something; to explore; to examine by inspection; as, to *search* the house for a book; to *search* the wood for a thief.' " *Kyllo*, 533 U.S. at 33 n.1 (quoting N. Webster, *An American Dictionary of the English Language* 66 (1828) (reprint 6th ed. 1989)). The defendant caseworkers' investigation on Greendale's premises easily meets this definition because the defendants went to the school for

the specific purpose of gathering information, an activity that most certainly constitutes a search under the Fourth Amendment. *Kyllo*, 533 U.S. at 32 n.1; *see also* 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.1(a) at 379 (1996) (noting that "[u]nder the traditional approach, the term 'search' is said to imply 'some exploratory investigation, or an invasion and quest, a looking for or seeking out' ") (citation omitted).

A person has been "seized" within the meaning of the Fourth Amendment if, in view of all of the circumstances surrounding the incident, a reasonable person would not have believed that he was free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *White v. City of Markham*, 310 F.3d 989, 993 (7th Cir. 2002). Here, the facts surrounding the defendants' seizure of John Doe Jr. are not in dispute. John Jr. was escorted from class by Principal Bond, the defendant caseworkers, and a uniformed police officer, into the church's nursery (which was empty). He was then questioned by Heck and Wichman, with the uniformed police officer present, for twenty minutes about intimate details of his family life. Under these circumstances, we conclude that John Jr. was "seized" with the meaning of the Fourth Amendment because no reasonable child would have believed that he was free to leave the nursery. *Brokaw*, 235 F.3d at 1010 (holding that the defendants' action of taking a child into custody, without the consent of his parents, for the purpose of questioning him about allegations of child neglect was a seizure under the Fourth Amendment).[15]

---

[15] *See also Roska v. Peterson*, 304 F.3d 982, 992 (10th Cir. 2002) (holding that 12-year-old boy was seized by a social worker while being removed from his home because he was "not free

(continued...)

Having concluded that the defendants searched Green-dale's premises and seized John Doe Jr., we must now "evaluate the search or seizure under traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton*, 526 U.S. 295, 299-300 (1999); *see also Brokaw*, 235 F.3d at 1010. In doing so, we recognize that although "the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place." *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985); s*ee also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654 (1995) (noting that "[w]hat expectations are legitimate [under the Fourth Amendment] varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park") (internal citation omitted).

The Supreme Court has explicitly recognized the "distinction between searches and seizures that take place on a man's property—his home or office—and those carried

---

[15] (...continued)
to leave"); *Kia P. v. McIntyre*, 235 F.3d 749, 762 (2d Cir. 2000) (holding that baby was seized by a government agency official during child abuse investigation even though an infant "is unlikely to have had a 'belief' as to whether or not she was free to leave the Hospital . . . [because her mother] was told in no uncertain terms that she could not take [her] home from the Hospital"); *Tenenbaum v. Williams*, 193 F.3d 581, 602 (2d Cir. 1999) (holding that 5-year-old girl was seized by a government official when she was taken from her school to a hospital where she was required to remain for several hours before being examined and returned to her parents).

out elsewhere," *Coolidge v. New Hampshire*, 403 U.S. 443, 474 (1971), holding that "a search or seizure carried out on . . . [private] premises without a warrant is per se unreasonable, unless the [government] can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.' " *Id.* at 474-75; *see also Camara*, 387 U.S. at 528-29; *United States v. Spears*, 965 F.2d 262, 271 (7th Cir. 1992).

Moreover, the principle that a warrantless search or seizure conducted on private property is presumptively unreasonable applies whether "the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards," *Barlow's*, 436 U.S. at 312-313, so long as the claimant had a reasonable expectation of privacy in the premises on which the search or seizure occurred. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (holding that the " 'capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place' ") (citation omitted); *see also Kyllo*, 533 U.S. at 31-33; *Siebert v. Severino*, 256 F.3d 648, 654 (7th Cir. 2001).

A reasonable expectation of privacy exists when: (1) the claimant exhibits an actual (subjective) expectation of privacy; and (2) the expectation is one that society is prepared to recognize as reasonable. *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002). Here, there is no question that the defendants' search of Greendale and seizure of John Doe Jr. took place on private property. The only question then is whether Greendale and John Jr. had a reasonable expectation of privacy in or within the school's premises. We conclude that they did.

Private schools, by their very nature, are controlled environments that, out of sheer necessity (i.e., for the

safety and protection of the children entrusted to them) are not open to the general public. *Simpson v. Saroff*, 741 F. Supp. 1073, 1078 (S.D.N.Y. 1990); *see also Siebert*, 256 F.3d at 654 (noting that an enclosed structure is typically a location for a property owner to engage in private activities, which is generally sufficient to place government agents on notice "to keep out"). Thus, by their very operation, private schools exhibit a subjective expectation of privacy in their premises.[16] *Simpson*, 741 F. Supp. at 1078 (holding that private school exhibited a subjective expectation of privacy in its premises "because it occupied them on a permanent basis, kept up the premises through expenditures on improvements, and exercised at all times the right to exclude others from the premises . . . ."). And while John Jr. may not have exhibited a subjective expectation of privacy in Greendale's premises, we have held that such a showing is unnecessary when the search or seizure at issue is of a young child. *Darryl H.*, 801 F.2d at 901 (holding that "[a] child of very tender years may not exhibit a subjective expectation of privacy in the same sense as an older child. He is, however, a human being, entitled to be treated by the state in a manner compatible with that human dignity."). In such cases, it is more appropriate to consider whether the child's parents manifested a subjective expectation of privacy in the premises within which the search or seizure being challenged took place. *Id.* (noting that when a child is searched by the government for purposes of a child abuse investigation, "[a]lso at stake . . . are the closely related legitimate expec-

---

[16] Additionally, in this case, Principal Bond and Pastor Holloway clearly expressed the school's subjective expectation of privacy in its premises by initially refusing to allow Bureau caseworkers to interview John Jr., and by refusing to permit the caseworkers to interview students during their second visit to the school.

tations of the parents or other caretakers, protected by the fourteenth amendment, that their familial relationship will not be subject to unwarranted state intrusion"). We conclude that by enrolling their son in Greendale, and entrusting him to the care of the school's officials *in loco parentis*, *Vernonia Sch. Dist.*, 515 U.S. at 654, the Does manifested a subjective expectation of privacy in the premises of the school.

Moreover, these subjective expectations of privacy were objectively reasonable. First, with respect to Greendale, "[t]he businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." *See v. City of Seattle*, 387 U.S. at 543; *cf. Curtis v. Thompson*, 840 F.2d 1291, 1300 (7th Cir. 1988) (noting that " '[w]ere the authority of government so trifling as to permit anyone with a complaint to have asked power to do anything he pleased . . . Churches would be compelled to welcome into their buildings invaders who came but to scoff and jeer . . . .' ") (citation omitted). Second, although a child's privacy interests while attending a private school may differ from those he has under his own roof, he unquestionably has a reasonable expectation of privacy in the premises of the school he attends vis-á-vis government officials. As the Supreme Court has explained, "[w]hen parents place minor children in private schools for their education, the teachers and administrators of those schools stand *in loco parentis* over the children entrusted to them." *Vernonia Sch. Dist.*, 515 U.S. at 654-55. In our view, there is no basis for concluding that when a minor child is entrusted to the care of a private school *in loco parentis* his reasonable expectation of privacy, vis-á-vis government officials, differs in any material respect from that which he would otherwise expect to receive at home. In both cases, the child is in an enclosed structure that is not open to the

general public, and is cared for and looked after by individuals with parental authority. Furthermore, it is entirely reasonable for parents who place their children in private schools, along with the teachers and administrators of those schools, to expect that the parents' express delegation of parental authority to school officials will be both acknowledged and respected by government actors. *Cf. Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1535 (7th Cir. 1996) (holding that "[t]he *in loco parentis* doctrine remains in full force in private schools"). Third, when, as in this case, the government conducts a warrantless search of a religious or parochial school, or seizes a minor child on the premises of such a school without a warrant, these actions implicate the constitutional rights of the school, child, and parents under the Free Exercise Clause of the First Amendment. *See Maryland v. Macon*, 472 U.S. 463, 468 (1985) (holding that when a government search or seizure implicates First Amendment rights, the requirements of the Fourth Amendment must be applied with "scrupulous exactitude"); *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (same).

Because we conclude that Greendale and John Doe Jr. had a reasonable expectation of privacy in and within the school's premises, the defendants' warrantless search of the school and seizure of the child are presumptively unreasonable, *Camara*, 387 U.S. at 528-29, and can only be upheld if either falls within one of the "few specifically established and well delineated exceptions" to the Fourth Amendment's warrant and probable cause requirements, *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (citations and internal quotations omitted), e.g., consent, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973), or exigent circumstances. *United States v. Karo*, 468 U.S. 705, 718 (1984). *See also Spears*, 965 F.2d at 271. These exceptions, however, are grudgingly granted because "the privacy interests pro-

tected by the Fourth Amendment are to be jealously guarded." *Wilson v. Health & Hosp. Corp. of Marion County*, 620 F.2d 1201, 1209 (7th Cir. 1980). In addition to these well established exceptions, the Supreme Court has also held that occasionally the government may have " 'special needs, beyond the normal need for law enforcement, [which] make the warrant and probable cause requirement impracticable.' " *Vernonia Sch. Dist.*, 515 U.S. at 653 (citation omitted). In "special needs" cases, a lower standard may be appropriate, "depend[ing] in part upon whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *Camara*, 387 U.S. at 533.

On appeal, however, the defendants make no attempt to argue that their search of Greendale or seizure of John Doe Jr. falls within any of the foregoing specifically established and well delineated exceptions, or that the search or seizure was justified by "special needs." Their failure to do so speaks volumes about the evidentiary record in this case, which clearly shows that the defendants' search of the school and seizure of the child were not done pursuant to a court order, probable cause, or exigent circumstances.[17] Instead, the defendants argue, taking their cue from the

---

[17] The record shows that it took the Bureau almost two months to process the report alleging that M.G. had been abused. Moreover, although the defendants claim that they were concerned that John Jr.'s parents may have subjected him to abuse by sending him to a school that used corporal punishment as a means of disciplining its students, they waited almost a month before deciding to report that John Jr. was in need of protective services. Finally, the defendants also waited several days before referring the other children of the plaintiff parents after John Jr. identified them as students who received spankings at the school.

district court's opinion, that their search of Greendale and seizure of John Jr. were reasonable under the guidelines established by this court in *Darryl H. v. Coler*, 801 F.2d 893 (7th Cir. 1986), and *Landstrom v. Illinois Dept. of Children & Family Services*, 892 F.2d 670 (7th Cir. 1990), both of which involved challenges to the constitutionality of child welfare caseworkers forcing children suspected of abuse to disrobe for physical examination on school grounds. 801 F.2d at 896-97; 892 F.2d at 671-72.

In *Darryl H.*, we held that, under the circumstances of that particular case, we could not "say that the Constitution requires that a visual inspection of the body of a child who may have been the victim of child abuse can only be undertaken when the standards of probable cause or a warrant are met." 801 F.2d at 902. Instead, we concluded that the constitutionality of these inspections should be evaluated under the reasonableness test of the Fourth Amendment, *id.*, and reaffirmed that holding in *Landstrom*. 892 F.2d at 677. The key difference between the searches at issue in *Darryl H.* and *Landstrom*, and the search and seizure in this case, is that the searches in *Darryl H.* and *Landstrom* took place on public school grounds with the consent of public school officials. 801 F.2d at 896-97; 892 F.2d at 671-72. We made express mention of this distinction in *Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir. 2000), where we held that the seizure of a child by a government official on private property—there, a home—is only reasonable if it is: (1) done pursuant to a court order; (2) supported by probable cause; or (3) justified by exigent circumstances, meaning that state officers had reason to believe that life or limb was in immediate jeopardy, *id.* at 1010, and cited our decisions in *Darryl H.* and *Landstrom* for the proposition that a lower standard of scrutiny applies to searches and seizures conducted by the government on public school property. *Id.* at 1011; *see also Good*

*v. Dauphin County Social Services*, 891 F.2d 1087, 1096 (3d Cir. 1989) (noting that "the strip search in this case came in the context of a forced entry into a residence in the middle of the night . . . [and that] the degree of intrusion on privacy was not all comparable to the far more limited intrusion in [*Darryl H. v.*] *Coler*"). Therefore, it is *Brokaw*, not *Darryl H.* and *Landstrom*, that controls our decision in this case.[18]

While the defendants are undoubtedly correct in asserting that private schools are subject to reasonable regulation by the state, and that states have a compelling interest in protecting children from child abuse, the critical question in this case "is *not* whether the public interest justifies the type of search [or seizure] in question, but whether the authority to search [or seize] should be evidenced by a warrant . . . ." *Camara*, 387 U.S. at 533 (citations omitted) (emphasis added). Thus, although "there may be circumstances in which the law of warrant and probable cause . . . does not work effectively in the child removal or child examination context," *Tenenbaum*, 193 F.3d at 604, e.g., when exigent circumstances are involved, child welfare caseworkers "can effectively protect children without be-

---

[18] *See also Roe v. Texas Dept. of Protective and Regulatory Services*, 299 F.3d 395, 407-08 (5th Cir. 2002) (holding that a social worker must demonstrate probable cause and obtain a court order, obtain parental consent, or act under exigent circumstances to justify the visual body cavity search of a juvenile in the home); *Wooley v. City of Baton Rouge*, 211 F.3d 913, 925-26 (5th Cir. 2000) (noting that a warrant, probable cause, or a reasonable belief that a child is in imminent harm is necessary to justify the seizure of a child from the home under the Fourth Amendment); *J.B. v. Washington County*, 127 F.3d 919, 929-30 (10th Cir. 1997) (applying probable cause standard to removal of child from home).

ing excused from '*whenever practicable*, obtain[ing] advance judicial approval of searches and seizures.' " *Id.* (citation omitted). Indeed, requiring caseworkers to obtain the equivalent of a warrant before searching the premises of a private school ensures that the constitutional interests of the child, parents, and school, are safeguarded, while at the same time preserving the state's compelling interest in protecting children from being abused. *Id.* (holding that "judicial authorization makes a fundamental contribution to the proper resolution of the tension among the interests of the child, the parents, and the State").

Finally, even if the search of Greendale and seizure of John Doe Jr. were not presumptively unreasonable, the defendants would fare no better under the "reasonableness" test outlined in *Landstrom* and *Darryl H. See generally* 892 F.2d at 676-77; 801 F.2d at 902-04. In conducting this test, we do not consider the government's interest in the abstract (i.e., the state's general interest in protecting children from abuse), but instead evaluate whether, under the circumstances of a particular case, the government officials in question had "some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Brokaw*, 235 F.3d at 1019; *see also Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000). As our analysis *infra* demonstrates, the defendants' search of Greendale and seizure of John Doe Jr. were not supported by such evidence. Given the foregoing, we conclude that Greendale and John Jr. have stated cognizable claims against the defendants under the Fourth Amendment. *See Saucier*, 533 U.S. at 201 (holding that "[i]n the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established").

Having resolved the threshold question of our inquiry, we now turn to the second step: whether the defendants, notwithstanding the foregoing constitutional violations, are entitled to qualified immunity from Greendale and John Doe Jr.'s claims. Under the doctrine of qualified immunity, government officials are " 'shielded from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known.' " *Doyle*, 305 F.3d at 620 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). For a constitutional right to be "clearly established," its contours " 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Hope v. Pelzer*, 122 S.Ct. 2508, 2515 (2002) (citation omitted). This does not mean that " 'an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.' " *Id.* (citations omitted). *See also Saucier*, 533 U.S. at 206 (noting that qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful"). Thus, a qualified immunity inquiry must be "undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. Greendale and John Jr. bear the burden of establishing the existence of a clearly established constitutional right. *White*, 310 F.3d at 993.

In this case, the defendant caseworkers' search of Greendale's premises and seizure of John Doe Jr. were done pursuant to Wis. Stat. § 48.981(3)(c)1, which provides that a Bureau caseworker may interview a child suspected of abuse "at any location"—other than the child's home— "without permission from the child's parent, guardian or legal custodian if necessary to determine if the child is in need of protection of services[.]" *Id.* As discussed *infra*,

to the extent § 48.981(3)(c)1 authorizes government officials to conduct an investigation of child abuse on private property without a warrant or probable cause, consent, or exigent circumstances, the statute is unconstitutional. At this stage of our analysis, however, we are only required to determine whether a reasonable Bureau caseworker should have known this to be the case.

The plaintiffs contend that a reasonable caseworker should have known that the search of Greendale's premises and the seizure of John Doe Jr. were unlawful because the Supreme Court has repeatedly held that, subject to a few specifically established and well-delineated exceptions, a warrantless search or seizure on private property is unreasonable under the Fourth Amendment. If the caseworkers had acted in the absence of statutory authority, this argument might have merit. The Supreme Court has held, however, that "[t]he enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979); *see also Woods v. City of Michigan City, Indiana*, 940 F.2d 275, 280-81 (7th Cir. 1991); *id.* at 282 (Will, J., concurring).

Although we conclude that § 48.981(3)(c)1 is unconstitutional as applied to Greendale and John Doe Jr., we are not prepared to hold that this statutory subsection is so patently unconstitutional as to deny the defendants qualified immunity from their claims. First, prior to this litigation the constitutionality of § 48.981(3)(c)1 had never been challenged. *DeFilippo*, 443 U.S. at 37 (noting, in the context of qualified immunity analysis, that "there was no controlling precedent that this ordinance was or was not constitutional . . . ."); *Benson v. Allphin*, 786 F.2d 268, 278 (7th

Cir. 1986) (noting that because the statute at issue had "never been challenged, it is difficult to see how the defendants could conclude that they were violating the clearly established First Amendment rights of the plaintiff . . ."). Second, although certainly not dispositive of the issue, we find it relevant that there is, to our knowledge, no reported decision (state or federal) addressing the precise issues before us. Finally, we think it would be especially draconian to expect a reasonable caseworker to conclude that § 48.981(3)(c)1 was "grossly and flagrantly unconstitutional" when, at the time the search and seizure took place, the Wisconsin Attorney General had issued a formal opinion on the legality of the statute, in which he noted that "under this broad grant of authority, the county may, in its discretion, *interview the child at any location, including the child's school.*" 79 Wis. Op. Att'y Gen. 49 (1990) (emphasis added); *see also V-1 Oil Co. v. State of Wyoming Dept. of Envtl. Quality*, 902 F.2d 1482, 1489 (10th Cir. 1990) (holding that "an officer who conducts a warrantless search on the same day he was advised by fully informed, high-ranking government attorneys that a particular statute, which had not yet been tested in any court, lawfully authorized that particular search . . . should not be expected to have known that the search was unconstitutional").

We, therefore, conclude that at the time the defendant caseworkers conducted their search of Greendale and seized John Doe Jr., a "reasonable" Bureau caseworker would not have understood his actions, vis-á-vis § 48.981(3)(c)1, to be unconstitutional under the Fourth Amendment.[19] *Hope*, 122 S.Ct. at 2515 (citation omitted)

---

[19] We reach this conclusion even though one of the case workers misrepresented to a police officer that there were exigent

(continued...)

(holding "[f]or a constitutional right to be clearly estab-
lished, its contours must be sufficiently clear that a rea-
sonable official would understand that what he is doing
violates that right") (internal quotes and citation omitted).
At this juncture, however, we now make it clear that it
is patently unconstitutional for governmental officials to
search the premises of a private or parochial school
and/or seize a child attending that school without a warrant
or court order, probable cause, consent, or exigent circum-
stances.[20] *Brokaw*, 235 F.3d at 1010.

---

[19] (...continued)
circumstances in order to gain entry into the school. The case-
worker's subjective bad faith has no bearing on whether, under
an "objective reasonableness" test, a "reasonable" caseworker
would be on notice that § 48.981(3)(c)1 was unconstitutional
as applied to Greendale—i.e., that, notwithstanding the statute,
the Fourth Amendment required the caseworker to obtain a
warrant prior to conducting a search of the premises. *See Wollin
v. Gondert*, 192 F.3d 616, 622 (7th Cir. 1999) (holding that " 'a
qualified immunity analysis entails a purely objective inquiry
to determine whether at the time of the alleged illegal act, the
right asserted by the plaintiff was clearly established in the
particular factual context presented' ") (citations omitted); *Harrell
v. Cook*, 169 F.3d 428, 431 (7th Cir. 1999) (noting that "[q]ualified
immunity depends on the objective legal reasonableness of the
defendants' actions, not on their subjective motivations").

[20] As previously noted, the defendants do not argue, and we
therefore do not address, the propriety of a generalized "special
needs" exception to the Fourth Amendment's warrant and
probable cause requirements for child abuse investigations
conducted on private property. Nevertheless, given that the
exigent circumstances exception already gives the State the ability
to take immediate action to ensure the physical safety of a
child suspected of abuse who is located on private property,
(continued...)

## B.   Familial Relations Claims

The plaintiffs—Greendale, John Doe Jr., John and Jane Doe, and seven other sets of parents (John and Jane Roe 1-7)—also allege that the manner in which the defendants conducted their investigation violated their constitutional right to familial relations under the Fourteenth Amendment's Due Process Clause. The Fourteenth Amendment to the United States Constitution provides that no State may "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. XIV, § 1. The Supreme Court has long recognized, as a component of "substantive" due process, that parents have a liberty interest in familial relations, which includes the right to "establish a home and bring up children" and "to control the education of their own." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *see also Troxel v. Granville*, 530 U.S. 57, 65 (2000) (noting that the right to familial relations is "the oldest of the fundamental liberty interests recognized");

---

[20] (...continued)

there is no apparent justification for carving out a "special needs" exception for child abuse investigations in this context. *See Ferguson v. City of Charleston*, 532 U.S. 67, 84 (2001) (noting that if the "broad[ ] social purpose or objective" of the state were the predominate consideration in a Fourth Amendment inquiry, "virtually any nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in terms of its ultimate, rather than immediate, purpose"); *Roe*, 299 F.3d at 403-05 (declining to apply the "special needs" balancing test to evaluate the constitutionality of a social worker's visual search of a child's body cavities in the home, conducted without a warrant, probable cause, or exigent circumstances, because the Supreme Court has held that "citizens have an especially strong expectation of privacy in their homes").

*Brokaw*, 235 F.3d at 1018 (same).[21] As we emphasized in *Brokaw*, "the right of a man and woman to marry, and to bear and raise their children is the most fundamental of all rights—the foundation of not just this country, but of all civilization."[22] 235 F.3d at 1018; *see also Smith v. Organization of Foster Families For Equality and Reform*, 431 U.S. 816, 845 (1977) (noting that "the liberty interest in family privacy has its source . . . not in state law, but in intrinsic human rights, as they have been understood in 'this Nation's history and tradition'") (citation omitted); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). Equally fundamental is the right of a child to be raised and nurtured by his parents.[23] *Santosky*, 455 U.S. at 760 (noting that "until

---

[21] *See also Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978); *Parham v. J.R.*, 442 U.S. 584, 602 (1979); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982).

[22] The integrity of the family unit has also found protection in the Ninth Amendment, *Stanley*, 405 U.S. at 651, and the Equal Protection Clause of the Fourteenth Amendment. *Id.*

[23] John Doe Jr. joins this claim to assert his related right to familial integrity. *Brokaw*, 235 F.3d at 1018. To the extent John Jr.'s familial relations claim is premised on his physical seizure at Greendale, however, it cannot succeed. The Supreme Court has made it abundantly clear that substantive due process may not be called upon when a specific constitutional provision (here, the Fourth Amendment) protects the right allegedly infringed upon. *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *Brokaw*, 235 F.3d at 1017. In other words, if a plaintiff's sole purpose in bringing a familial relations claim is to recover damages for a physical seizure, then that claim is more appro-

(continued...)

the state proves parental unfitness, the child and his parents *share* a vital interest in preventing erroneous termination of the natural relationship") (emphasis added); *Brokaw*, 235 F.3d at 1018 (same). Finally, we note that in *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1924), the Supreme Court held that private schools have the right to bring claims against the state for arbitrarily interfering with their patrons' (i.e., parents' and students') liberty interest in familial relations.[24] *Id.* at 534-36; *see also Darryl H.*, 801 F.2d at

---

[23] (...continued)

priately analyzed under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989) (holding that "[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against . . . physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims"). On the other hand, if, as here, a familial relations claim specifically alleges that the government's physical seizure coincided with other conduct amounting to an interference with the parent-child relationship (e.g., custodial interview of child by government officials without the consent of his parents and without reasonable suspicion that parents were abusing the child or that the child was in imminent danger of abuse), that allegation of harm constitutes a separate and distinct violation of a separate fundamental constitutional right and both claims may therefore be maintained. *Brokaw*, 235 F.3d at 1018-19.

[24] In *Pierce*, the Supreme Court explained the basis of the private schools' standing to bring familial relations claims as follows:

Appellees are corporations, and therefore, it is said, they cannot claim for themselves the liberty [in familial relations] which the Fourteenth Amendment guarantees. Accepted in the proper sense, this is true. But they have business

(continued...)

901 (noting that "caretakers" of children have derivative parental privacy interests under the Fourteenth Amendment in being free from "unwarranted state intrusion").

Despite the sweeping language used by the Supreme Court in describing the "fundamental" constitutional liberty interest parents have "in the care, custody, and control of their children," *Troxel*, 530 U.S. at 65, the appropriate standard of review for claims alleging a violation of this interest is less than clear. It is well established that when a fundamental constitutional right is at stake, courts are to employ the exacting strict scrutiny test, *Clark v. Jeter*, 486 U.S. 456, 461 (1988). In *Troxel v. Granville*, however, a plurality of the Supreme Court—Chief Justice Rehnquist

---

[24] (...continued)

> and property for which they claim protection. These are threatened with destruction through the unwarranted compulsion which appellants are exercising over present and prospective patrons of their schools. And this court has gone very far to protect against loss threatened by such action . . . . Generally, it is entirely true . . . that no person in any business has such an interest in possible customers as to enable him to restrain exercise of proper power of the state upon the ground that he will be deprived of patronage. But the [appellees] . . . are not [seeking to restrain] . . . the exercise of any proper power . . . . [only] protection against arbitrary, unreasonable, and unlawful interference with their patrons and the consequent destruction of their business and property. Their interest is clear and immediate . . . .

*Id.* at 535-36.

Like the private schools in *Pierce,* Greendale has an interest in operating its business free from unreasonable governmental interference with the relationships of families who choose to enroll their children in its school.

and Justices O'Connor, Ginsburg, and Breyer—used a "combination of factors" test to hold that a state's visitation statute, as applied, unconstitutionally infringed on parents' fundamental right to rear their children.[25] 530 U.S. at 72-73. In making this determination, the plurality emphasized that "there is a [constitutional] presumption that fit parents act in the best interests of their children," *id.* at 68, and "[a]ccordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68-69. The *Troxel* plurality declined to define "the precise scope of the parental due process right in the visitation context," *id.* at 73, noting that "constitutional protections in this area are best 'elaborated with care.'" *Id.* (quoting Justice Kennedy's dissent, *id.* at 101). Justice Thomas concurred in the judgment of the Court, noting "I agree with the plurality that this Court's recognition of a fundamental right to direct the upbringing of their children resolves this case . . . . The opinions of the plurality, Justice Kennedy, and Justice Souter recognize such a right, but curiously none of them articulates the appropriate standard of review. I would apply strict scrutiny to infringements of fundamental rights." *Id.* at 80.

Thus, after *Troxel*, it is not entirely clear what level of scrutiny is to be applied in cases alleging a violation of the fundamental constitutional right to familial relations. What is evident, however, is that courts are to use some

---

[25] The statute at issue in *Troxel* permitted "any person" to petition a state court for visitation rights "at any time," and authorized the court to grant such rights whenever "visitation may serve the best interest of the child." 530 U.S. at 60.

form of heightened scrutiny in analyzing these claims. *Id.* at 65 (noting that the Due Process Clause of the Fourteenth Amendment includes a substantive component that 'provides heightened protection against governmental interference with certain fundamental rights and liberty interests' "); *Brokaw*, 235 F.3d at 1018 (same).

The right to familial relations is not, however, absolute. *Berman v. Young*, 291 F.3d 976, 983 (7th Cir. 2002); *Brokaw*, 235 F.3d at 1019. The liberty interest in familial privacy and integrity is " 'limited by the compelling governmental interest in the protection of children particularly where the children need to be protected from their own parents,' " *Brokaw*, 235 F.3d at 1019 (citation omitted), and does not include the right to be free from child abuse investigations. *Brown v. Newberger*, 291 F.3d 89, 94 (1st Cir. 2002); *Watterson v. Page*, 987 F.2d 1, 8 (1st Cir. 1993). Nevertheless, it is necessary for both government officials and the courts to "be sensitive to the fact that society's interest in the protection of children is . . . multifaceted, composed not only with concerns about the safety and welfare of children from the community's point of view, but also with the child's psychological well-being, autonomy, and relationship to the family or caretaker setting." *Frantz v. Lytle*, 997 F.2d 784, 792-93 (10th Cir. 1993); *see also Tenenbaum*, 193 F.3d at 595.

Therefore, when analyzing a familial relations claim, a "balance must be reached between the fundamental right to the family unit and the state's interest in protecting children from abuse . . . ." *Brokaw*, 235 F.3d at 1019. In weighing these competing interests, we do so under the same reasonableness test used to evaluate Fourth Amendment claims, *id.*; *Darryl H.*, 801 F.2d 901-02 n.7, under which we are required to consider: (1) the nature of the privacy interest upon which the action taken by the State intrudes;

(2) the character of the intrusion that is complained of; (3) the nature and immediacy of the governmental concern at issue; and (4) the efficacy of the means employed by the government for meeting this concern. *Vernonia Sch. Dist.*, 515 U.S. at 654-60; *Joy v. Penn-Harris-Madison Sch. Corp.*, 212 F.3d 1052, 1058-59 (7th Cir. 2000). This analytical framework allows courts to determine whether the governmental action taken was "justified at its inception," *Darryl H.*, 801 F.2d at 903, and "reasonably related in scope to the circumstances which [allegedly] justified the interference in the first place." *Id.* Thus, although child welfare caseworkers may investigate allegations of child abuse without violating parents' constitutional right to familial relations, they may not do so arbitrarily. *Tenenbaum*, 193 F.3d at 600; *Croft v. Westmoreland County Children and Youth Services*, 103 F.3d 1123, 1126 (3d Cir. 1997).

On appeal, the plaintiffs argue that the defendants unreasonably interfered with their right to familial relations by: (1) conducting a custodial interview of John Doe Jr. without notifying or obtaining the consent of his parents;[26] (2) targeting the plaintiff parents as child abusers; and (3) causing the plaintiff parents to fear that their children would be removed from their custody, without any

---

[26] The defendants may have also violated the "parental" rights of Greendale, exercised by the school's officials *in loco parentis*, by interviewing John Jr. on school grounds without its consent. We decline to address this issue, however, because the allegation of abuse leveled against Principal Bond (of M.G.) makes this a far closer question, and because, notwithstanding any direct claim it might have, Greendale also has a derivative claim against the defendants for their failure to notify and obtain consent from the Does, in the absence of any reason to suspect them of child abuse, before interviewing John Jr. *Pierce*, 268 U.S. at 534-36; *Darryl H.*, 801 F.2d at 901.

evidence giving rise to a reasonable suspicion that the plaintiff parents were abusing their children or that the children were in imminent danger of abuse.[27]

Having already considered the nature of the privacy interests upon which the plaintiffs claim the defendants have intruded, and the character of the intrusion complained of, we now turn to the third and fourth prongs of the familial relations balancing test, the nature and immediacy of the governmental concern at issue and the efficacy of the means employed by the defendants for meeting this concern. As a threshold matter, these inquires must be considered in tandem to determine whether the governmental actions challenged were based on "some definite and articulable evidence giving rise to a reasonable suspicion that a child ha[d] been abused or [was] in imminent danger of abuse." *Brokaw*, 235 F.3d at 1019; *see also Croft*, 103 F.3d at 1126 (same). If not, neither the state nor its officials have any interest whatsoever "in protecting children from their parents," and no further inquiry (i.e., balancing of interests) is necessary. *Id.*

In assessing the reasonableness of the defendants' actions in this case, we begin with the constitutional presumption that "fit parents act in the best interests of their children," *Troxel*, 530 U.S. at 68, and stress that unless government officials have evidence calling into question the fitness of a parent, there is "no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions

---

[27] The plaintiffs also allege that the defendants' "disruption of their children's education at Greendale" also violated their right to familial relations. They failed to develop this argument on appeal, however, and thus have waived it. *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 706 n.4 (7th Cir. 2002).

concerning the rearing of that parent's children." *Id.* at 68-69. The Bureau's own Investigation Standards take this presumption into account by providing that "[w]hen a child has been [allegedly] maltreated by an individual outside the family, [caseworkers] should act as collaborators with and consultants to the parents[,] [because] [p]arents are the best resource for meeting children's needs." The Bureau also has an "interview protocol," which requires caseworkers to begin their investigation by contacting the parents of the child allegedly abused, "[u]nless there is information suggesting that parental action or inaction contributed to the circumstances of the maltreatment or that the parents' reaction to the incident has been detrimental to the child . . . ."

Here, the defendants not only failed to presume that the plaintiff parents would act in the best interest of their children, they assumed the exact opposite, that the parents might be complicit in any abuse that may have been meted out by Principal Bond because Greendale's parent/student handbook specified the use of a "swat" as a method of discipline at the school. Indeed, this is the only reason given by the defendants in support of their claim that it was reasonable for them to interview John Jr. without notifying or obtaining the consent of his parents and to target the plaintiff parents as child abusers (i.e., open files on them and interview, or attempt to interview, their children without their consent).[28] The defendants took

---

[28] Defendant Wichman believed that it was appropriate to interview John Doe Jr. without notifying or obtaining the consent of his parents because he "was concerned about the young ages of the children who were subject to this type of physical discipline . . . [and because] the parent/student handbook
(continued...)

these actions despite the fact that there was no evidence that: (1) the plaintiff parents were aware that the Bureau was investigating Bond for abusing a former student; (2) any of the plaintiff parents' children had ever been injured as a result of a spanking administered by Bond; or (3) the plaintiff parents had ever mentally or physically abused their children.

Given these facts it is apparent that the defendants treated corporal punishment as child abuse *per se*. By doing so, the defendants not only disregarded the constitutional presumption "that fit parents act in the best interests of their children," *Troxel*, 530 U.S. at 68, they also ignored the Bureau's own Investigation Standards, which emphasize that "[c]orporal punishment . . . does not, in itself, constitute a report of child physical abuse." According to these standards, "[r]eports of physical abuse must suggest that a child has been or may have been physically injured by the act of the teacher or other school employee."

Furthermore, although the Supreme Court has not "set out exact metes and bounds to the protected interest of a parent in the relationship with his child," *Troxel*, 530 U.S. at 78 (Souter, J., concurring), the fundamental right of

---

[28] (...continued)
specified this type of punishment was used, and that the parents may be aware of this method of physical discipline and were not protecting their children." Based on her review of Greendale's parent/student handbook and Wichman's reports concerning M.G., defendant Hansen "decided that further investigation into the circumstances of [John Jr.] who was reported [by M.G.] to have been swatted was in order." Hansen was "concerned after reviewing the [school's parent/student] [h]andbook that parents of Greendale Baptist Academy children might be failing to protect their children from possible abuse at [the school]."

parents to direct the upbringing of their children necessarily includes the right to discipline them. *Meyer*, 262 U.S. at 399 (holding that the "liberty" guaranteed by the Fourteenth Amendment "denotes . . . the right of the individual to . . . establish a home and bring up children . . . and . . . enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men").[29]

Additionally, the fundamental right of parents to discipline their children includes the right to delegate that right to private school administrators. As previously noted, when parents place minor children in private schools for their education, "the teachers and administrators of those schools stand *in loco parentis* over the children entrusted to them." *Vernonia Sch. Dist.*, 515 U.S. 646, 654 (1995). This is because a parent "may . . . delegate part of his parental authority, during his life, to the tutor or schoolmaster of his child; who is then *in loco parentis*, and has such a portion of the power of the parent committed to his charge, viz. *that of restraint and correction*, as may be necessary to answer the purposes for which he is employed." *Id.* at 655 (quoting 1 William Blackstone, *Blackstone's Commentaries on the Laws of England* 441 (1769)) (emphasis added).

And while it is not our place to enter the longstanding fray over the appropriateness of corporal punishment, we recognize, as the Supreme Court has, that the view that

---

[29] See 3 William Blackstone, *Blackstone's Commentaries on the Laws of England* 120 (1765) (noting the legality of parents and teachers giving moderate physical "correction" to the children entrusted to their care); 2 James Kent, *Commentaries on American Law* 169 (1826) (noting that parents have "a right to the exercise of such discipline, as may be requisite for the discharge of their sacred trust").

"corporal punishment serves important educational inter-ests" is deeply rooted in this republic's history. *Ingraham v. Wright*, 430 U.S. 651, 681 (1977). We also acknowledge that people of many faiths, and perhaps some of no faith at all, genuinely believe in the truth of the oft-recited phrase: "Spare the rod, and spoil the child." John Bartlett, *Bartlett's Familiar Quotations* 263:21 (Justin Kaplan ed., 16th ed. 1992) (phrase attributed to a poem by Samuel Butler entitled "Hudibras").

However, no matter one's view of corporal punishment, the plaintiff parents' liberty interest in directing the up-bringing and education of their children includes the right to discipline them by using reasonable, nonexcessive corporal punishment, and to delegate that parental author-ity to private school officials.[30] *See Meyer*, 262 U.S. at 399; *Ingraham*, 430 U.S. at 661 (noting that at common law, "a single principle has governed the use of corporal punish-ment since before the American Revolution: Teachers may impose reasonable but not excessive force to dis-cipline a child").[31]

---

[30] We also recognize that when parents decide to send their children to a religious or parochial school they oftentimes do so as an "exercise" of their religious beliefs. *See Prince v. Massa-chusetts*, 321 U.S. 158, 165 (1944) (noting "[t]he rights . . . of parents to give [their children] religious training and to encour-age them in the practice of religious belief . . . ."); *Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1533 (9th Cir. 1985) (holding "[t]he free exercise clause recognizes the right of every person to choose among types of religious training and observance, free of state compulsion").

[31] In *Ingraham*, the Supreme Court noted that:

> Blackstone catalogued among the "absolute rights of indi-viduals" the right "to security from the corporal insults of

(continued...)

In making this determination, we are by no means suggesting that the right of parents to discipline their children is absolute or that parents are immune from being investigated for child abuse. *Brokaw*, 235 F.3d at 1019 (holding that "the constitutional right to familial integrity is not absolute"); *Croft*, 103 F.3d at 1125 (noting that "[t]he right to familial integrity . . . does not include a right to remain free from child abuse investigations"). The right of parents to discipline their children does not give them a license to abuse them. It does, however, preclude state officials from interfering with the right of parents to physically discipline their children or to delegate the authority to do so to private school officials, unless there is evidence that the discipline being administered is patently unreasonable or excessive.[32]

---

[31] (...continued)

> menaces, assaults, beating, and wounding," 1 W. Blackstone, Commentaries 134, but he did not regard it a "corporal insult" for a teacher to inflict "moderate correction" on a child in his care. To the extent that force was "necessary to answer the purposes for which (the teacher) is employed," Blackstone viewed it as "justifiable or lawful." *Id.* at 453; 3 *id.* at 120. *This basic doctrine has not changed.*

430 U.S. at 661 (emphasis added).

[32] In fact, we have held that unless there is evidence that the physical contact or discipline in question was severe or excessive, even "a single hitting of a child" will not give rise to a reasonable suspicion of child abuse because:

> [W]ere that the case, nearly any practitioner or case worker who has ever witnessed a slapping of a child would be under a legal duty to report the occurrence to the designated agency—and every parent who ever slapped or spanked a child would face the possibility of losing custody
>
> (continued...)

Here, because the defendants had no evidence giving rise to a reasonable suspicion that the plaintiff parents were abusing their children, or that they were complicit in any such abuse, the defendants violated the plaintiffs' right to familial relations by conducting a custodial interview of John Doe Jr. without notifying or obtaining the consent of his parents and by targeting the plaintiff parents as child abusers. *See Wallis*, 202 F.3d at 1138 (holding that government officials "cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued . . . ."); *Croft*, 103 F.3d at 1127 (holding that allegations of neglect were insufficient, as a matter of law, to establish that caseworker had reasonable basis to suspect that a child was in imminent danger of abuse).

Finally, Mr. and Mrs. John Doe and John Jr. allege that the defendants violated their right to familial relations by threatening to remove the Doe children from their parents' custody.[33] In support of this claim, the Does point to the message defendant Heck left in their voice mail on December 28, 1998, stating that if she had not heard from the Does' attorney within 24 hours "the Bureau will take steps to . . . protect the children in your home . . . under Chapter 48" and that she was "not messing around any-

---

[32] (...continued)
    of the child . . . . While one instance of child-hitting may raise a red flag, it does not immediately become a "suspicion" of child abuse.

*Lewis v. Anderson*, 308 F.3d 768, 774 (7th Cir. 2002), cert. denied, *Lewis v. Stolle*, ___S. Ct. ___, 2003 WL 256933 (March 10, 2003).

[33] There is nothing in the record to support the other plaintiff parents' assertions that the defendants threatened to remove their children from their custody.

more!" The Does also note that on the same day this threat was made, defendant Wichman had a meeting with Sergeant Belli and Officer Adamczak of the Greendale Police Department, during which he advised them that if the Does did not have their attorney contact the Bureau within the next 24 hours, he and Heck planned to go to their residence and physically remove the children from their custody.

We conclude that the defendants' threat to remove John Jr. and his sister from the custody of their parents violated the Does' right to familial relations, which includes a liberty interest in the maintenance of the family unit. *Stanley*, 405 at 651; *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977). This protection is especially important where, as here, "we are concerned with the most essential and basic aspect of familial privacy—the right of the family to remain together without the coercive interference of the awesome power of the state." *Duchesne*, 566 F.2d at 825. The interest being protected is not only that of the "parent in the 'companionship, care, custody and management of his or her children,' [but also] of the children in not being dislocated from the 'emotional attachments that derive from the intimacy of daily association,' with the parent." *Id.* (citations omitted). Although it is true the defendants did not make good on their threat, the threat alone implicates the Does' liberty interest in familial relations. *Sundbye v. Ogunleye*, 3 F. Supp. 2d 254, 262-64 (E.D.N.Y. 1998). Moreover, in this case, the defendants' threat to remove the Does' children from their custody is sufficient, in and of itself, to support the Does' claims because the defendants had no reason whatsoever to suspect that Mr. and Mrs. Doe were abusing their children. *See, e.g., Miller v. City of Philadelphia*, 174 F.3d 368, 376 (3d Cir. 1999) (holding that when a social worker "threaten[s] to remove a child from the home if the father himself

d[oes] not leave . . . the social worker effectively remove[s] the child from the parents' custody"); *Croft*, 103 F.3d at 1124-27 (holding that right to familial relations was violated when child welfare caseworker gave a father "an ultimatum . . . [that] unless he left his home and separated himself from his daughter until the investigation was complete, she would take [his daughter] physically from the home . . . and place her in foster care"). *See also Brokaw*, 235 F.3d at 1019 (holding that "a state has no interest in protecting children from their parents unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse").

We recognize that child welfare caseworkers are often called upon to make difficult decisions without the benefit of extended deliberation. And there is, perhaps, no more worthy object of the public's concern than preventing the most vulnerable members of society, children of tender years, from being physically abused. *Darryl H.*, 801 F.2d at 902. This unquestionably compelling state interest, however, may not be used as a pretense for arbitrary governmental intrusion into the private affairs of its citizens. Indeed, in many cases, parents send their children to private schools because they fundamentally disagree with the manner in which the government chooses to operate its public school system. Furthermore, some parents enroll their children in religious or parochial schools so that they will be educated in an environment that reinforces certain religious beliefs and values. These are important constitutional interests (i.e., right to familial relations and free exercise of religion) that should not be interfered with by government officials unless there is a compelling reason for doing so. *See Meyer*, 262 U.S. at 399 (noting right of parents "to control the education of their own"); *Norwood v. Harrison*, 413 U.S. 455, 461 (1973) (noting that "a state's

role in the education of its citizens must yield to the right of parents to provide an equivalent education for their children in a privately operated school of the parents' choice"); *Committee for Pub. Educ. and Religious Liberty v. Nyquist*, 413 U.S. 756, 788 (1973) (holding that "a state law interfering with a parent's right to have his child educated in a sectarian school would run afoul of the Free Exercise Clause").

Although there are undoubtedly cases where it is difficult to weigh a state's interest in investigating an allegation of child abuse against a parent or child's right to familial relations, this is not one of them. Here, the defendants had no basis to suspect the plaintiff parents of child abuse, and thus had no reason to interfere with their familial relationships in the manner described herein. We, therefore, conclude that the plaintiffs have adequately stated claims against the defendants for violating their right to familial relations.

The defendants are, nevertheless, entitled to qualified immunity from the plaintiffs' familial relations claims. As previously noted, the plaintiffs' claims proceed on three separate and distinct grounds: (1) the defendants' custodial interrogation of John Jr. without notifying or obtaining the consent of his parents; (2) the defendants' investigation of the plaintiff parents for child maltreatment because they authorized private school officials to use corporal punishment as a means of disciplining their children; and (3) the defendants' threat to remove John Jr. and his sister from their parents' custody. As to the first ground, the defendants are entitled to qualified immunity because a reasonable caseworker would have believed that 48.981(3)(c)1 gave him the authority to question John Jr. at school without notifying or obtaining the consent of his parents. The defendants are also entitled to qualified im-

munity on the second ground; because, although the plaintiff parents' right to physically discipline their children, or to delegate that right to private school officials, could have been gleaned from a close reading of Supreme Court precedent, we are not prepared to hold that the right was clearly established so as to have placed the defendants on notice, at the time of their investigation, that treating corporal punishment as *per se* child abuse violated the plaintiffs' right to familial relations. *Sweaney v. Ada County, Idaho*, 119 F.3d 1385, 1389 (9th Cir. 1997) (noting that "[t]he fact that a court could interpret [Supreme Court precedent] broadly to hold that a parent has a constitutional right to [spank his] child . . . does not demonstrate that this protection is clearly established . . . . [i.e.,] that the constitutional norm relied upon is the logical extension of principles and decisions already in the books"); *see also Doyle*, 305 F.3d at 620 (holding that "it is not the simple existence of analogous case law that defeats the claim of qualified immunity; rather, these decisions must demonstrate that, at the time the defendants acted, it was certain that their conduct violated the law"); *Suboh v. District Attorney's Office of Suffolk Dist.*, 298 F.3d 81, 93 (1st Cir. 2002) (holding that "[a]rticulating the right as one of 'familial integrity' casts too broad a net. The inquiry into whether a right is clearly established 'must be undertaken in light of the specific context of the case, not as a broad general proposition'") (citation omitted). Finally, the defendants are also entitled to qualified immunity on the third ground, that the threat to remove the Does' children from their custody violated their right to familial relations. While there are a few cases in other jurisdictions holding that a government official violates the right to familial relations by threatening to remove a child from his parents' custody, *see, e.g., Miller*, 174 F.3d at 376; *Croft*, 103 F.3d at 1124-27, the law in this circuit did not place a reason-

able child welfare caseworker on notice that such conduct was clearly unconstitutional.

Thus, although we find many of the actions taken by the defendants during the course of their investigation quite disturbing, we cannot, as a matter of law, hold that a reasonable caseworker or supervisor would have known that conducting a child abuse investigation in the manner outlined herein violated the plaintiffs' constitutional right to familial relations.

## C. "Procedural" Due Process Claims

The plaintiffs also contend that the defendants' actions in this case denied all of them procedural due process. In a procedural due process claim, the deprivation by the state of a constitutionally protected interest in "life, liberty, or property" is not in and of itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law. *Brokaw*, 235 F.3d at 1020. A procedural due process claim involves a two-step inquiry: (1) whether the defendants deprived the plaintiffs of a constitutionally protected liberty or property interest; and (2) if so, whether that deprivation occurred without due process of law. *Zinerman v. Burch*, 494 U.S. 113, 125 (1990); *Doyle*, 305 F.3d at 616.

Our analysis up to this point demonstrates that the plaintiffs have satisfied the first step by adequately alleging claims for illegal search, illegal seizure, and violation of the right to familial relations. We, therefore, turn to the second step of the inquiry: what process was due. In addressing this question, we note that "the precise timing and form of the procedures that the government must afford an individual hinge upon the particularities of the situation," and that due process, " 'unlike some legal rules,

is not a technical conception with a fixed content unrelated to time, place, and circumstances.'" *Doyle*, 305 F.3d at 618 (citation omitted). To the contrary, "due process is flexible, requiring different procedural protections depending on the situation at hand." *Id.*

In order to ascertain the amount of process constitutionally due in a given case, we consider: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *see also Doyle*, 305 F.3d at 618. In this case, however, the *Mathews* balancing test was essentially subsumed into our analysis of the plaintiffs' underlying constitutional claims, all of which required a balancing of the plaintiffs' interests against those of the government. *Brokaw*, 235 F.3d at 1020 n.16 (noting that a "single act" can give rise to both a substantive and procedural due process claim); *Darryl H.*, 801 F.2d at 901-02 n.7. (noting that although "[f]ourteenth amendment due process analysis obviously differs in some respects from fourth amendment analysis . . . . both interests can be treated together . . . . [because] [w]hether substantive due process rights are at stake, or procedural due process rights are at stake, a court must essentially weigh the privacy interest of the family member against the interests of the government").

Given the foregoing, we conclude that the plaintiffs have stated claims against the defendant for violating their right to procedural due process by: (1) failing to obtain a warrant or court order before searching Greendale's

premises and seizing John Doe Jr.; (2) interrogating John Jr. without first notifying his parents and obtaining their consent; and (3) investigating the plaintiff parents for child abuse and threatening to remove the Does' children from their custody without definite and articulable evidence giving rise to a reasonable suspicion that the plaintiff parents had abused their children or that the children were in imminent danger of being abused.

Nevertheless, as with the underlying constitutional claims, the defendants are entitled to qualified immunity from plaintiffs' procedural due process claims. The defendants searched Greendale's premises, seized John Doe Jr., and interrogated John Jr., relying on the "authority" granted to them by § 48.981(3)(c)1. Moreover, as noted *supra*, to the extent the defendants investigated the plaintiff parents solely due to their use of or support for corporal punishment, or threatened to remove the Does' children from their custody, the law in this area was not clearly established so as to place the defendants on notice that their actions were clearly unconstitutional. The defendants are, therefore, entitled to qualified immunity from plaintiffs' procedural due process claims.

### D.  Facial and As Applied Challenges to the Constitutionality of Wisconsin Stat. § 48.981(3)(c)1

Finally, we conclude our analysis by addressing the plaintiffs' argument that § 48.981(3)(c)1 is unconstitutional, both facially and as applied. We begin with the plaintiffs' as applied challenge. As we have noted on numerous occasions, "it is a proper exercise of judicial restraint for courts to adjudicate as-applied challenges before facial ones in an effort to decide constitutional attacks on the narrowest possible grounds and to avoid reaching unnecessary con-

stitutional issues." *Commodity Trend Serv., Inc. v. Commodity Futures Trade Comm'n*, 149 F.3d 679, 689 n.5 (7th Cir. 1998).

As our foregoing analysis demonstrates, § 48.981(3)(c)1 is clearly unconstitutional as applied to the plaintiffs. This statutory provision permits government officials to interview a child at "any location without permission from the child's parent, guardian or legal custodian if necessary to determine if the child is in need of protection of services . . . ." § 48.981(3)(c)1. Although the purpose behind this legislative enactment is no doubt well intended, governmental objectives may not override the constitutional protections afforded by the Fourth and Fourteenth Amendments. Thus, to the extent § 48.981(3)(c)1 authorizes government officials to interview children suspected of being abused on private property without a warrant, probable cause, consent, or exigent circumstances, it is clearly unconstitutional as applied.

We reject the plaintiffs' contention that § 48.981(3)(c)1 is facially unconstitutional. The Supreme Court has held that a facial challenge to the constitutionality of a statute will only succeed if a plaintiff can "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Because § 48.981(3)(c)1 can be applied constitutionally (e.g., when government officials interview a child on public school property because they have definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused by his parents or is imminent danger of parental abuse), the plaintiffs' facial challenge may not be sustained.

**III**.

For the reasons expressed in this opinion, the district court's judgment is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*